395 F.3d 25
 Shadi DABIT, on behalf of himself and all others similarly situated, Plaintiff-Appellant,
v.
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., a corporation, Defendant-Appellee.
IJG Investments and Irlys Guy, on behalf of themselves and all others similarly situated, Plaintiffs-Appellants,
v.
Merrill Lynch & Co., Inc., Defendant-Appellee.
 No. 03-7499.
 No. 03-7458.
 United States Court of Appeals, Second Circuit.
 Argued: December 15, 2003.
 Decided: January 11, 2005.
 
 COPYRIGHT MATERIAL OMITTED Clell I. Cunningham, Dunn, Swan & Cunningham (William B. Federman and Stuart B. Emmons, Federman & Sherwood, on the brief), Oklahoma City, Oklahoma, for plaintiff-appellant Shadi Dabit.
 Ira Neil Richards (Joanne G. Noble), Trujillo Rodriguez & Richards, LLC (Mark Wermerskirchen, Darval, Wermerskirchen & Frank P.A., Samuel D. Heins and Stacey Mills, Heins Mills & Olson, P.L.C., Kenneth A. Wexler, The Wexler Firm, and Anthony J. Bolognese, Bolognese & Associates, LLC, on the brief), Philadelphia, Pennsylvania, for plaintiffs-appellants IJG Investments and Irlys Guy.
 Jay B. Kasner, Skadden, Arps, Slate, Meagher & Flom LLP (Edward J. Yodowitz, Scott D. Musoff, Joanne Gaboriault, on the brief), New York, New York, for defendants-appellees.
 Before: OAKES, SOTOMAYOR and WESLEY, Circuit Judges.
 SOTOMAYOR, Circuit Judge.
 
 
 1
 These two separate appeals, consolidated for purposes of oral argument and opinion, present an issue of first impression in this Circuit: whether the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), Pub.L. No. 105-353, 112 Stat. 3227, which preempts certain class actions based upon state law brought by private parties alleging a misrepresentation or omission "in connection with the purchase or sale" of certain nationally traded securities, SLUSA § 101(b), 112 Stat. at 3230 (codified at 15 U.S.C. § 78bb(f)), preempts claims that do not allege that putative class members purchased or sold particular securities in reliance upon the defendant's alleged misconduct. Plaintiffs brought the instant actions in the wake of an investigation by the New York Attorney General into conflicts of interest that arose within certain large investment firms. Both actions alleged that defendants-appellees Merrill Lynch & Co., Inc. and Merrill Lynch Pierce Fenner Smith, Inc. (collectively, "Merrill Lynch")[1] issued biased research and investment recommendations designed to garner investment banking business and sought relief under state law. Plaintiff-appellant Shadi Dabit ("Dabit") brought a putative class action against Merrill Lynch in the United States District Court for the Western District of Oklahoma on diversity grounds. Plaintiffs-appellants IJG Investments Limited Partnership ("IJG Investments") and Irlys Guy (collectively, "IJG") brought a putative class action against Merrill Lynch in Minnesota state court. After removal of the IJG action to federal court and subsequent coordinated proceedings of both actions in the Southern District of New York, the district court dismissed the lawsuits under Federal Rule of Civil Procedure 12(b)(6) as preempted by SLUSA.
 
 
 2
 On appeal, plaintiffs contend that SLUSA does not preempt their actions because their complaints do not allege misrepresentations or omissions of material fact "in connection with the purchase or sale of ... covered securit [ies]." Dabit argues that SLUSA's "in connection with" requirement is not satisfied because he seeks only (i) "holding" damages — damages incurred because Merrill Lynch fraudulently induced him to retain certain securities — and (ii) commissions that he would have earned from clients that he lost by recommending securities touted in Merrill Lynch's allegedly false research reports. IJG argues that preemption is inappropriate because it seeks merely "the cost of doing business" — specifically, flat fees and commissions — relating to IJG's payments for access to Merrill Lynch's proprietary research, a nexus asserted to be insufficiently "in connection with" the purchase or sale of securities to trigger preemption.
 
 
 3
 For reasons to be discussed, we hold that (i) the meaning of "in connection with" under SLUSA is coterminous with the meaning of the nearly identical language of § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), Pub.L. No. 73-291, 48 Stat. 881, 891 (1934) (codified at 15 U.S.C. § 78j(b)), and its corresponding Rule 10b-5, 17 C.F.R. § 240.10b-5, and (ii) the purchaser-seller rule of Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), applies as a limit on SLUSA's "in connection with" requirement such that SLUSA does not preempt claims that do not allege purchases or sales made by the plaintiff or the alleged class members. Dabit's "holding" and IJG's commissions-based claims satisfy SLUSA's conditions requiring preemption because they contain implicit allegations of purchases made by plaintiffs and putative class members. Thus, we affirm the judgment below to the extent it found these claims preempted. We vacate, however, so much of the judgment as dismissed Dabit's lost-commission claim and dismissed the remaining claims with prejudice, and remand to the district court to dismiss these claims without prejudice so that plaintiffs may (if the pertinent facts warrant) bring new actions that do not include allegations of fraud "in connection with the purchase or sale of a ... security."
 
 BACKGROUND
 
 4
 We summarize below the allegations of Dabit's and IJG's complaints, and assume their truth, as we must upon review of a dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). Ideal Steel Supply Corp. v. Anza, 373 F.3d 251, 254 (2d Cir.2004).
 
 1. Dabit's Complaint and Amended Complaint
 
 5
 Dabit, a former broker of Merrill Lynch, initially sued on April 26, 2002, on behalf of himself and other current and former Merrill Lynch brokers who, from December 1, 1999, through December 31, 2000, (i) purchased and refrained from selling Merrill Lynch-recommended securities because of Merrill Lynch's misleading research and recommendations, and (ii) lost clients as a result of purchases of recommended stocks on behalf of clients and Merrill Lynch's alleged misconduct. Dabit alleged breaches of fiduciary duty and of the covenants of good faith and fair dealing (presumably under Oklahoma law — the complaint does not tell us). Dabit filed his action in the United States District Court for the Western District of Oklahoma, alleging jurisdiction on diversity grounds. The complaint attached two exhibits: a list of stocks purchased by Dabit and recommended to Dabit's alleged lost customers during the class period based on Merrill Lynch's recommendation (the "ML stocks"); and a report prepared by the Office of the Attorney General of New York concerning Merrill Lynch's scheme to attract investment banking business by overrating certain stocks and causing the inflation of their prices. The complaint further alleged that Merrill Lynch's "manipulative efforts," which included illegal sales efforts described as "the hallmarks of stock manipulation," caused these stocks to trade at "artificially inflated" prices. On October 11, 2002, the district court dismissed Dabit's initial complaint as preempted by SLUSA, calling it a "hopeless melange of purchase-related and holding-related assertions." Nevertheless, the district court allowed Dabit to re-plead because it was "conceivable that claims based on wrongfully-induced holding could be pleaded."
 
 
 6
 In his amended complaint, filed on October 21, 2002, Dabit replaced the original complaint's numerous references to purchases of securities with references instead to the owning or holding of securities. For example, Dabit's putative class was amended to include those brokers who
 
 
 7
 owned and continued to own one or more of the [Merrill Lynch] recommended securities ... or recommended such securities to their clients during the period of December 1, 1999 through December 31, 2000[,] ... and who suffered damages as a result of owning and holding such [Merrill Lynch] Stocks during this time period, or who suffered damages as a consequence of the loss of clients due to [Merrill Lynch's] wrongful actions....
 
 
 8
 Dabit also removed the original complaint's discussion of Merrill Lynch's alleged illegal sales efforts. The amended complaint, however, attached the same exhibits as the original complaint and contained several of the same allegations concerning Merrill Lynch's causing certain stocks to trade at "artificially inflated" prices through the use of deceptive devices alleged to be the "hallmarks of stock manipulation." As in the initial complaint, the breach of fiduciary duty and breach of covenants of good faith and fair dealing were the only claims asserted.
 
 
 9
 On October 23, 2002, the Judicial Panel for Multidistrict Litigation conditionally transferred the Dabit action to the Southern District of New York where more than 120 additional cases against Merrill Lynch arising from the New York Attorney General's investigation were being centralized. The Panel also transferred five other putative class actions alleging state law claims in connection with Merrill Lynch's false research (including IJG's action) to the Southern District of New York for coordinated proceedings before Judge Pollack. Merrill Lynch moved to dismiss Dabit's complaint under Rule 12(b)(6) as preempted by SLUSA.
 
 2. IJG's Complaint
 
 10
 On June 7, 2002, IJG filed its putative class action in Minnesota state court, asserting breach of contract and consumer fraud claims under Minnesota law for damages arising from its relationship as a retail brokerage customer of Merrill Lynch.[2] The crux of IJG's complaint is that Merrill Lynch provided biased investment advice in violation of its contract with IJG.
 
 
 11
 The contracts at issue arose out of retail cash management accounts opened by IJG Investments, an investment partnership, and Guy, an individual investor, with Merrill Lynch. Specifically, Guy maintained a cash management account with Merrill Lynch, and the partnership held the business counterpart of that account, a working capital management account. Merrill Lynch charged IJG an annual participation fee for subscription to these accounts, which IJG paid. IJG asserts that it and Merrill Lynch understood that the fees paid were in exchange for objective research promised by Merrill Lynch. Merrill Lynch also charged IJG commissions for engaging in securities trades in its brokerage account.
 
 
 12
 IJG's complaint, like Dabit's, alleged that Merrill Lynch issued false and misleading reports concerning publicly traded securities in order to garner investment banking business for Merrill Lynch. Despite the alleged understanding that IJG paid fees and commissions in exchange for objective research, the complaint asserted, Merrill Lynch "routinely used biased advice as a way to curry favor with various companies in order to sell investment banking services to those companies" and in return "earned lucrative investment banking fees."
 
 
 13
 IJG defined its putative class to include "[a]ll persons or entities who maintained retail brokerage accounts with Merrill Lynch, and who paid a commission or fees to Merrill Lynch." The complaint sought damages for injuries caused by the research reports' lack of objectivity. Under one cause of action, IJG alleged that Merrill Lynch's "conduct caused senior citizens to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance." Notwithstanding this broad description of potential damage claims regarding senior citizens, IJG's prayer for relief asserted that it sought only restitution of "funds wrongly withheld, charged or retained" by Merrill Lynch and "actual damages including, but not limited to, attorney fees, costs and expenses incurred in paying for valueless services." IJG maintains on this appeal that it seeks to recover only the amounts paid as (i) flat fees and (ii) commissions paid for purchases or sales of securities falsely reviewed by Merrill Lynch, and thus not on any losses stemming from the diminished values of securities actually bought or sold.
 
 
 14
 On July 5, 2002, Merrill Lynch removed the IJG action to the United States District Court for the District of Minnesota on the grounds of diversity and SLUSA preemption. The Judicial Panel for Multidistrict Litigation conditionally transferred the case to the Southern District of New York on November 27, 2002 and consolidated it with several other actions before Judge Pollak (including Dabit's) related to Merrill Lynch's allegedly improper stock research. IJG moved to remand its case on January 9, 2003. In opposition, as discussed above, Merrill Lynch moved to dismiss the complaint and three of the other complaints, including Dabit's, pursuant to Rule 12(b)(6) for failure to state a claim as a result of SLUSA preemption.
 
 
 15
 3. The District Court's Dismissal of Both Actions
 
 
 16
 In an opinion and decision dated April 10, 2003, the district court denied IJG's motion to remand and dismissed, inter alia, both actions with prejudice as preempted under SLUSA. The district court found the state law claims to be "based on the very same alleged series of transactions and occurrences asserted in the federal securities actions currently being coordinated before this Court," and held that the claims "fall squarely within SLUSA's ambit" because they allege "misrepresentations or omissions of material facts or [a] manipulative or deceptive device or contrivance in connection with the purchase or sale of a nationally traded security." These timely appeals followed.
 
 DISCUSSION
 
 17
 We review de novo a ruling dismissing an action for failure to state a claim pursuant to Rule 12(b)(6). Ortiz v. McBride, 380 F.3d 649, 653 (2d Cir.2004). All inferences must be drawn in favor of the nonmoving party. Id. We may affirm the dismissal only if "`it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim[s] which would entitle [them] to relief.'" McEachin v. McGuinnis, 357 F.3d 197, 200 (2d Cir.2004) (quoting Flores v. S. Peru Copper Corp., 343 F.3d 140, 148 (2d Cir.2003) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957))). The district court's determination regarding SLUSA preemption is a conclusion of law and we therefore review it de novo. See Lander v. Hartford Life & Annuity Ins. Co., 251 F.3d 101, 107 (2d Cir.2001).
 
 1. SLUSA's Enactment and Scope
 
 18
 Congress enacted SLUSA in 1998 in response to the perceived failure of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub.L. No. 104-67, 109 Stat. 737 (codified in part at 15 U.S.C. §§ 77z-1, 78u-4) to curb abuses of federal securities fraud litigation arising under the Securities Act of 1933 ("Securities Act"), Pub.L. No. 73-22, 48 Stat. 74 (1933) (codified as amended at 15 U.S.C. § 77a et seq.), and the Exchange Act. SLUSA § 2, 112 Stat. at 3227; Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 292 F.3d 1334, 1340 (11th Cir.2002); Lander, 251 F.3d at 107-08. In construing the meaning of terms found in SLUSA, "we must view SLUSA in this larger statutory context." Riley, 292 F.3d at 1340.
 
 
 19
 Section 10(b) of the Exchange Act makes it "unlawful for any person ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe...." 15 U.S.C. § 78j(b). The SEC promulgated an accompanying rule, Rule 10b-5, which provides in part:
 
 
 20
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 
 
 21
 (a) To employ any device, scheme, or artifice to defraud,
 
 
 22
 (b) To make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 
 
 23
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
 
 
 24
 
 in connection with the purchase or sale of any security.
 
 
 
 25
 17 C.F.R. § 240.10b-5 (emphasis added). Although Congress initially enacted § 10(b) "envision[ing] that the SEC would enforce the statutory prohibition through administrative and injunctive actions," Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 173, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), abrogated on other grounds by PSLRA § 104, 109 Stat. at 757 (codified at 15 U.S.C. § 78t), the federal courts have long recognized that the statute and its implementing rule give rise to a private cause of action for damages and injunctive relief. See Superintendent of Ins. v. Bankers Life & Casualty Co., 404 U.S. 6, 13 n. 9, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); see also Blue Chip, 421 U.S. at 730, 95 S.Ct. 1917 (noting that judicial implication of private right of action under § 10(b) and Rule 10b-5 provides "`a necessary supplement to Commission action.'" (citing J.I. Case Co. v. Borak, 377 U.S. 426, 432, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964))).
 
 
 26
 Finding that plaintiffs were abusing this private cause of action by bringing meritless class actions — so-called "strike suits" — in the hope of coercing large settlements, Congress enacted the PSLRA in 1995 to provide more stringent and uniform standards for securities fraud class actions and other suits that alleged fraud in the securities markets. See Lander, 251 F.3d at 107 (citing H.R. Conf. Rep. No. 105-803 (1998)). Among other reforms, the PSLRA imposed heightened pleading standards for class actions alleging fraud in the sale of national securities and imposed a mandatory stay on discovery pending judicial determination of the legal sufficiency of the claims.[3] PSLRA §§ 101(a),(b), 109 Stat. at 741, 746-47 (codified at 15 U.S.C. §§ 77z-1(b), 78u-4(b)).
 
 
 27
 As noted above, Congress enacted SLUSA in 1998 in response to the perceived failure of the PSLRA to achieve its goals. Congressional investigation revealed a "federal flight" loophole whereby many class action plaintiffs avoided the PSLRA's heightened requirements by bringing suit in state courts under state statutory or common law rather than in federal court. See Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 332 F.3d 116, 123 (2d Cir.2003); Lander, 251 F.3d at 108 ("[T]he decline in federal securities class action suits that occurred after the passage of [the] PSLRA was accompanied by a nearly identical increase in state court filings." (citing H.R. Conf. Rep. No. 105-803)); see also SLUSA § (2), 112 Stat. at 3227. In enacting SLUSA, Congress intended to close this loophole "by making federal court the exclusive venue for class actions alleging fraud in the sale of certain covered securities and by mandating that such class actions be governed exclusively by federal law." Lander, 251 F.3d at 108.
 
 In pertinent part, SLUSA provides that:
 
 28
 No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging —
 
 
 29
 (A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or
 
 
 30
 (B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.
 
 
 31
 15 U.S.C. § 78bb(f)(1).[4] It further provides that such actions may be removed to federal court. 15 U.S.C. § 78bb(f)(2). Thus, four conditions must be satisfied to trigger SLUSA's removal and preemption provisions: (1) the underlying suit must be a "covered class action"[5]; (2) the action must be based on state or local law; (3) the action must concern a "covered security"; and (4) the defendant must have misrepresented or omitted a material fact or employed a manipulative or deceptive device or contrivance "in connection with the purchase or sale of" that security. Riley, 292 F.3d at 1342.
 
 
 32
 This Court has noted that in enacting SLUSA, "Congress could not have spoken more clearly" about its intention "to completely preempt the field of certain types of securities class actions by essentially converting a state law claim into a federal claim and creating federal jurisdiction and venue for specified types of state securities fraud claims." Spielman, 332 F.3d at 123 (emphasis omitted). As we explained in Spielman, complete preemption "manifests a [c]ongressional policy determination that the `state law claim in that area is of necessity so federal in character that it arises under federal law.' "Id. at 123 n. 5 (quoting Cicio v. Does, 321 F.3d 83, 92 (2d Cir.2003) (further internal quotation omitted)). It therefore "provides in practice an exception to the well-pleaded complaint rule," id., such that when SLUSA's conditions have been satisfied, "the plaintiff has necessarily invoked federal question jurisdiction, even though he [or she] did not wish to," and the court must dismiss for failure to state a claim because SLUSA has preempted the state law basis for the claim, id. at 131-32 (Newman, J., concurring).
 
 
 33
 Under SLUSA, then, we must look beyond the face of the complaint to analyze the substance of the allegations made. "[P]erhaps mindful that SLUSA was intended to block artful plaintiffs, courts have gone beyond asking whether the removed complaint contains the talismanic phrase `in connection with,' and have looked also to whether the allegations, if true, would satisfy the `in connection with' requirement." Id. at 133 n. 5; see also Dudek v. Prudential Sec., Inc., 295 F.3d 875, 879 (8th Cir.2002) (stating that where complete preemption applies, "plaintiff may not avoid federal question jurisdiction and the preemption of state law claims by artfully concealing the federal question in an otherwise well-pleaded complaint under state law").
 
 
 34
 Both IJG and Dabit allege that Merrill Lynch misrepresented the value of certain stocks, which are concededly covered securities under SLUSA, in order to attract investment banking business, all in violation of either Minnesota or Oklahoma law. Accordingly, plaintiffs do not dispute that their lawsuits are SLUSA "covered class actions" based upon state statutory or common law or, with the exception of one of IJG's claims, that they involve misrepresentations and omissions that concern SLUSA-defined "covered securities." Rather, the principal question on this appeal is whether these purported misrepresentations and omissions were alleged to be "in connection with the purchase or sale" of the covered securities for purposes of SLUSA.
 
 2. SLUSA's "In Connection With" Requirement
 
 35
 A. The Applicability of § 10(b) and Rule 10b-5 Jurisprudence
 
 
 36
 In determining the meaning of the broad phrase "in connection with the purchase or sale of a covered security" under SLUSA, we turn first to the language of the statute, for "[t]he starting point in every case involving construction of a statute is the language itself." Blue Chip, 421 U.S. at 756, 95 S.Ct. 1917 (Powell, J., concurring). SLUSA, however, nowhere defines the phrase, and the Supreme Court has not yet interpreted this phrase in the context of SLUSA. The phrase has been extensively interpreted by the Supreme Court and the lower federal courts in the context of § 10(b) and Rule 10b-5, see Blue Chip, 421 U.S. at 731-32, 95 S.Ct. 1917, and the parties and the SEC as amicus curiae urge us to refer to this body of law in construing SLUSA. We are persuaded that this is the correct approach.[6]
 
 
 37
 All of the federal courts of appeals that have considered the issue have relied upon judicial interpretation of "in connection with" under § 10(b) and Rule 10b-5 in construing SLUSA. See Riley, 292 F.3d at 1342 (listing circuit court and district court cases); see also Falkowski v. Imation Corp., 309 F.3d 1123, 1129 (9th Cir.2002); Green v. Ameritrade, Inc., 279 F.3d 590, 597-98 (8th Cir.2002).[7] In concluding that § 10(b) and Rule 10b-5 jurisprudence concerning the "in connection with" language applies to SLUSA, the Eleventh Circuit reasoned that "where Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." Riley, 292 F.3d at 1342 (internal quotation and alteration marks omitted). Further, as observed in Riley and by the Ninth Circuit in Falkowski, the application of § 10(b) jurisprudence is particularly appropriate because SLUSA is legislation intended to shore up the PSLRA, which in turn related to abuse of that provision. Falkowski, 309 F.3d at 1129 ("SLUSA should... be viewed as part of the remedial package of federal securities laws and should be construed accordingly."); accord Riley, 292 F.3d at 1342. For this reason, the Eleventh Circuit in Riley noted:
 
 
 38
 In enacting SLUSA, ... Congress was not writing on a blank slate; instead, it was legislating in an area that had engendered tremendous amounts of litigation and received substantial judicial attention. In using the phrase "in connection with the purchase or sale of a covered security," Congress was not creating language from a vacuum; instead, it was using language that, at the time of SLUSA's enactment, had acquired settled, and widely-acknowledged, meaning in the field of securities law, through years of judicial construction in the context of § 10b-5 lawsuits. Under these circumstances, we must presume that Congress intended the phrase "in connection with the purchase or sale of a covered security" to have the same meaning in SLUSA that it has in § 10b-5.
 
 
 39
 292 F.3d at 1342-43.
 
 
 40
 We agree in full with this reasoning. "When ... judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its ... judicial interpretations as well." Bragdon v. Abbott, 524 U.S. 624, 645, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998); see also Lorillard v. Pons, 434 U.S. 575, 581, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978) ("[W]here ... Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute."); Strom v. Goldman, Sachs & Co., 202 F.3d 138, 147 (2d Cir.1999) ("Congress is presumed ... to be aware of prior judicial interpretations of similar statutory provisions."). Nothing in SLUSA's text or legislative history evinces a congressional intent to overcome this presumption. On the contrary, the application of this jurisprudence to the language as repeated in SLUSA comports with Congress's stated goal in enacting SLUSA of closing the "federal flight loophole" by stemming the migration of claims from federal to state court. See SLUSA § 2, 112 Stat. at 3227 (finding that "a number of securities class action lawsuits have shifted from Federal to State courts" and reciting that SLUSA aims to "prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives of the [PSLRA]"); accord Lander, 251 F.3d at 107-08. If the "in connection with" phrase is read to reach the same conduct under SLUSA as it does under § 10(b) and Rule 10b-5, then SLUSA will preempt precisely those state class actions which could be brought as federal actions subject to the heightened requirements of the PSLRA. If it were otherwise, actions might be preempted for meeting all of SLUSA's requirements, including the "in connection with" term, but not be capable of being brought under federal law for failure to meet the parallel requirement of Rule 10b-5, a result that the legislative history does not suggest Congress intended to produce in enacting SLUSA.[8]
 
 
 41
 B. The Meaning of "In Connection With" a Purchase or Sale of Securities Under § 10(b) and Rule 10b-5
 
 
 42
 Long ago the Supreme Court instructed that the "in connection with" language in § 10(b) and Rule 10b-5 "must be read flexibly, not technically and restrictively" so that "novel" and "atypical" as well as "garden type variety" frauds do not escape its prohibitive scope. Superintendent of Ins., 404 U.S. at 11 n. 7, 12, 92 S.Ct. 165 (1971); see also SEC v. Zandford, 535 U.S. 813, 819, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002) (holding that § 10(b) should be "construed not technically and restrictively, but flexibly to effectuate its remedial purposes" (internal quotation and citation omitted)); Steiner v. Ames Dep't Stores, Inc. (In re Ames Dep't Stores Inc. Stock Litig.), 991 F.2d 953, 964 (2d Cir.1993). Our cases have accordingly given an "expansive[ ]" construction to the "in connection with" requirement. United States v. Russo, 74 F.3d 1383, 1392 (2d Cir.1996).
 
 
 43
 The reach of the "in connection with" phrase, while broad, is of course not unlimited. "[T]he incidental involvement of securities d[oes] not implicate the anti-fraud provisions of the federal securities laws." Pross v. Katz, 784 F.2d 455, 459 (2d Cir.1986) (citing Chemical Bank v. Arthur Andersen & Co., 726 F.2d 930 (2d Cir.1984)). The fraud must be "integral to the purchase and sale of the securities in question." Id. at 459; see also Falkowski, 309 F.3d at 1131 (holding that the fraud and stock sale must be "more than some tangential relation"). Zandford, the Supreme Court's most recent elaboration of the "in connection with" requirement, cautions that the phrase must not "be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b)." 535 U.S. at 820, 122 S.Ct. 1899. In that case the Court held that a deceptive practice may be "in connection with" a securities transaction if it "coincide[s]" with the transaction, even where the fraud does not relate to the value of any particular investment vehicle. Id. Thus, while the Court held that a broker's fraudulent scheme of selling his clients' securities for his own benefit satisfied the "in connection with" requirement even though the fraud did not relate to the investment value of a security, the Court also noted in dicta that fraud unattached to any particular purchase or sale — such as outright embezzlement from the client's account — would not. Id. at 820, 825 n. 4, 122 S.Ct. 1899.
 
 
 44
 The question of whether a given fraud arises "in connection with the purchase or sale" of a security so as to give rise to a private action for damages is subject to an important procedural limitation as well. While the SEC or the United States may bring an enforcement action under the Rule so long as "someone buy[s] or sell[s] the security during the period of allegedly fraudulent conduct," 8 Louis Loss & Joel Seligman, Securities Regulation 3721 (3d ed.2004), private litigants may only bring an action under Rule 10b-5 when they are themselves purchasers or sellers of the securities in question. First announced in Judge Augustus Hand's seminal decision in Birnbaum v. Newport Steel Corp., 193 F.2d 461, 463-64 (2d Cir.1952), this rule of standing gained wide acceptance throughout the lower federal courts; the Supreme Court ultimately ratified it in Blue Chip, 421 U.S. at 754-55, 95 S.Ct. 1917.
 
 
 45
 In Blue Chip, a putative class of offerees of shares in a newly reorganized company sued under § 10(b) and Rule 10b-5 on the basis that the prospectus distributed in association with the offering was overly pessimistic. See id. at 726, 95 S.Ct. 1917. The complaint alleged that the defendants had issued an intentionally and misleadingly sour prospectus to discourage purchases by the alleged class of offerees so that the rejected shares could then be sold at a premium to the public. Id. at 726-27, 95 S.Ct. 1917. After noting Congress's failure to adopt proposed amendments that would have made § 10(b) applicable to "attempts" to purchase or sell securities, the Court noted that "the longstanding acceptance [of the standing rule] by the courts" and Congress's "failure to reject Birnbaum's reasonable interpretation of the wording of § 10(b)" provided persuasive justification to affirm the Birnbaum rule and to restrict the 10b-5 remedy to actual purchasers and sellers of securities. Id. at 733, 95 S.Ct. 1917. Because private securities fraud actions were a creature of judicial implication and "[n]either Congress ... [n]or the Securities and Exchange Commission ... foreordained the present state of the law with respect to Rule 10b-5," the Court found it proper to take policy considerations into account in determining the propriety of the standing rule. Id. at 737, 95 S.Ct. 1917. Among the policy justifications for the rule was the concern that without it, "the door w[ould] be open to recovery of substantial damages on the part of one who offers only his own testimony" to prove that the defendant's fraud caused him, as the case might be, to fail to purchase or to fail to sell the security in question. Id. at 746, 95 S.Ct. 1917. In contrast, imposition of the purchaser-seller rule would restrict recovery to those who could prove the "objectively demonstrable fact" of actual purchase or sale and would prevent vexatious lawsuits supported only by plaintiffs' self-serving testimony. Id. at 747, 95 S.Ct. 1917. Such lawsuits were ipso facto likely to survive summary judgment and therefore to exact an "in terrorem ... settlement" out of proportion to their likely merit. Id. at 741, 95 S.Ct. 1917. The Court acknowledged that the standing rule was "an arbitrary restriction which unreasonably prevents some deserving plaintiffs from recovering damages which have in fact been caused by violations of Rule 10b-5." Id. at 738, 95 S.Ct. 1917; see also id. at 743, 95 S.Ct. 1917 ("The Birnbaum rule undoubtedly excludes plaintiffs who have in fact been damaged by violations of Rule 10b-5, and to that extent it is undesirable."). But the Court noted that "this disadvantage is attenuated to the extent that remedies are available to nonpurchasers and nonsellers under state law." Id. at 738 n. 9, 95 S.Ct. 1917.
 
 
 46
 This Court and others have applied the Blue Chip purchaser-seller rule of standing to bar claims alleging fraudulently induced retention or delayed sales of securities. See, e.g., Abrahamson v. Fleschner, 568 F.2d 862, 868 (2d Cir.1977) (rejecting 10b-5 "holding" claims where plaintiffs fraudulently induced not to sell their securities), disapproved on other grounds, Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); see also Gurley v. Documation Inc., 674 F.2d 253, 256-57 (4th Cir.1982) (recognizing that literal application of Blue Chip does not foreclose a claim that the fraud caused a plaintiff to sell later than he otherwise would, but concluding that "the policies underlying the Blue Chip decision persuade[ ] us that one who claims that he was fraudulently induced to delay a sale of securities must, like a nonseller, be denied standing under § 10(b)"), abrogated in part on other grounds by Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 361, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991); O'Brien v. Cont'l Illinois Nat. Bank & Trust Co. of Chicago, 593 F.2d 54, 58 (7th Cir.1979).
 
 
 47
 C. Application of the Blue Chip Rule to SLUSA
 
 
 48
 Although, as noted above, the parties and the SEC are in general agreement that the meaning of SLUSA's "in connection with" requirement is the same as under § 10(b) and Rule 10b-5, the parties dispute the applicability of the purchaser-seller rule of standing as a substantive limit on the preemptive reach of that phrase as used in SLUSA. Merrill Lynch contends that the standing rule is irrelevant to whether a claim is preempted by SLUSA. The SEC joins in Merrill Lynch's position. Alternatively, Merrill Lynch argues that even supposing that the rule applies, SLUSA's "in connection with" requirement has been satisfied in both of the instant cases because plaintiffs' claims include allegations of actual purchases. In opposition, plaintiffs claim that Blue Chip's purchaser-seller rule applies to "in connection with" under SLUSA and that because they do not seek damages based upon any actual purchases or sales of securities, preemption is inappropriate here.
 
 
 49
 As discussed below, we find defendants' and the SEC's position concerning the applicability of Blue Chip's purchaser-seller rule unpersuasive. Congress employed language with a settled judicial interpretation of which Blue Chip was a part and we see no clear indication either in the text or the legislative history of SLUSA of a congressional intent to abolish nonpurchaser and nonseller state class action claims.[9] We do not, however, fully agree with plaintiffs' contentions that their actions cannot be read as alleging a purchase or sale of securities in connection with the alleged fraud.
 
 
 50
 Merrill Lynch and the SEC argue first that because the Blue Chip rule is a judicially-crafted rule of standing for a private litigant to maintain an action under § 10(b) and Rule 10b-5, and not an aspect of the substantive fraud prohibition itself, the rule should not be regarded as a limit on the meaning of the "in connection with" phrase and therefore on SLUSA's preemptive scope. The limitation on standing to bring private suit for damages for fraud in connection with the purchase or sale of securities is unquestionably a distinct concept from the general statutory and regulatory prohibition on fraud in connection with the purchase or sale of securities. Ontario Pub. Serv. Employees Union Pension Trust Fund v. Nortel Networks Corp., 369 F.3d 27, 34 (2d Cir.2004) (observing that "the issue of standing" should not be conflated "with the question of whether the `in connection with' requirement ha[s] been met"); see also Blue Chip, 421 U.S. at 751 n. 14, 95 S.Ct. 1917 (noting that even where a private party does not have standing to bring an action under Rule 10b-5, the SEC may bring an enforcement action that satisfies the "in connection with" requirement); SEC v. Rana Research, Inc., 8 F.3d 1358, 1364 (9th Cir.1993) ("[R]estrictions on who may invoke the power of the federal judiciary to enforce the securities laws by collecting damages do not bear on the determination of whether a violation of the securities laws has been committed."). That observation, however, has little persuasive force in this context, because SLUSA deals with precisely the category of actions subject to the purchaser-seller rule. Once it is agreed that Congress deliberately borrowed SLUSA's "in connection with" language from § 10(b), the fact that the standing rule is analytically distinct from the underlying prohibition on fraud does not compel the conclusion that SLUSA preempts more than the purchaser/seller category of private damages claims over which the "in connection with" source language operates. Because only purchasers and sellers have a federal private damages remedy, it is far more natural to suppose that Congress meant to import the settled standing rule along with the "in connection with" phrase as a substantive standard. Nor are we moved by the observation that the standing rule is merely a judge-made gloss on the statute and the Rule, because private Rule 10b-5 damages actions are themselves a creature of judicial implication. See Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 593, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) ("[W]e have made no pretense that it was Congress' design to provide the [private 10b-5] remedy afforded." (internal quotation omitted)); SEC v. Materia, 745 F.2d 197, 202 (2d Cir.1984) ("The private right of action under that section is a judicial, rather than a legislative creation.").
 
 
 51
 Second, the SEC also argues that the policy considerations underlying SLUSA militate against application of the purchaser-seller rule. Observing that SLUSA aimed to shore up the PSLRA's remedial goal of curbing meritless strike suits, the SEC contends that it would be anomalous for Congress to have meant to carry over the purchaser-seller rule as a limiting construction of the "in connection with" language, because the effect would be to allow the very category of claims that the Supreme Court identified in Blue Chip as posing a particularly high risk of vexatious litigation. This argument has some force as a matter of policy. See Amanda M. Rose, Life after SLUSA: What Is the Fate of Holding Claims?, 69 Def. Couns. J. 455, 462 (2002) ("[T]o some degree the persistence of holding claims may undermine the goals of the [PSLRA]."). The question in interpreting ambiguous statutory language, however, is not what Congress might sensibly want to do, but what Congress did. Cf. American Airlines, Inc. v. Wolens, 513 U.S. 219, 238, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995) (O'Connor, J., concurring in the judgment in part and dissenting in part) (arguing that while the majority "arrive[d] at what might be a reasonable policy judgment as to when state law actions ... should be pre-empted if we were free to legislate it," the conclusion was not consistent with the relevant statute as previously interpreted). As noted, Congress defined SLUSA's preemptive scope by borrowing language with a settled judicial interpretation in the context of private damages actions, and such borrowing implicates the strong presumption that Congress is aware of and approves that construction. Under that construction, the Supreme Court held that the judicially-adopted bar on federal non-purchaser and non-seller claims was counterbalanced by the existence of remedies under state law. Blue Chip, 421 U.S. at 738 n. 9, 95 S.Ct. 1917; see also Small v. Fritz Cos., Inc., 30 Cal.4th 167, 132 Cal.Rptr.2d 490, 65 P.3d 1255, 1261 (2003) ("[T]he high court's decision in Blue Chip Stamps, while recognizing policy considerations [weighing against holding claims], did not view those considerations as justification for a total denial of relief to defrauded holders; it reasoned only that the federal courts could deny a forum to wronged stockholders who are not sellers or buyers without unjust consequences because these stockholders retained a remedy in state courts."). SLUSA's wholesale importation of the language that gave rise to this balancing judgment must therefore be presumed to represent a ratification of that judgment. Cf. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 381-82, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982) (explaining that Congress's "comprehensive reexamination and significant amendment" of the Commodities Exchange Act coupled with its failure to abrogate a provision of the Act under which courts had implied a cause of action, "is itself evidence that Congress affirmatively intended to preserve" that implied right of action); Calif. Public Employees' Ret. Sys. v. WorldCom, Inc., 368 F.3d 86, 105 & n. 17 (2d Cir.2004) (noting, in analyzing conflict between statutes including one amended by SLUSA, the "presumption that a prior legal rule should be retained if no one in legislative deliberations even mentioned the rule or discussed any changes in the rule" and concluding that "in light of its complete silence in 1998 with respect to [the conflict there at issue], Congress did not alter [the] preexisting rule when it enacted SLUSA." (internal quotation omitted)).
 
 
 52
 "[I]n deciding if federal law pre-empts state law ... we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." City of Milwaukee v. Illinois, 451 U.S. 304, 316, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981) (internal quotations omitted). Thus we will not regard a federal statute as completely preemptive of state law "absent some express statement or other clear manifestation from Congress." Marcus v. AT&T Corp., 138 F.3d 46, 54 (2d Cir.1998) (citing Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 65-68, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987)); see also Spielman, 332 F.3d at 123 n. 5 ("[T]he complete preemption doctrine must be applied sparingly and with great restraint."). There is no clear support in the legislative history for the conclusion that Congress intended SLUSA to preempt claims that do not satisfy the Blue Chip rule.
 
 
 53
 The legislative history includes some language that generally indicates a broad preemptive intent,[10] but contains no specific mention of holding claims or other non-purchaser/non-seller claims. See Joshua D. Ratner, Stockholders' Holding Claim Class Actions under State Law after the Uniform Standards Act of 1998, 68 U. Chi. L.Rev. 1035, 1059 (2001) (reviewing legislative history and suggesting that Congress may have been unaware of the existence of state law holding claims when it enacted SLUSA). In fact, to the extent the legislative history casts any light on the question, it suggests that Congress intended to preempt only those state claims that had migrated from federal court in response to the PSLRA. The statute itself explicitly states that it is intended to "prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives of the [PSLRA]." SLUSA § 2(5), 112 Stat. at 3227 (emphasis added). The conference report reiterates that the purpose of SLUSA's removal and preemption provisions "is to prevent plaintiffs from seeking to evade the protections that Federal law provides against abusive litigation by filing suit in State, rather than in Federal, court," H.R. Conf. Rep. No. 105-803, at 13, 1998 WL 703964 (emphasis added), suggesting that Congress understood that it was only preempting claims that could have been brought in federal court to begin with. See also id. at 15 (noting that "solution" to the problem of disparate state liability regimes was to "make Federal court the exclusive venue for most securities fraud class action litigation involving nationally traded securities") (emphasis added).
 
 
 54
 The bill's primary proponents also indicated their understanding that SLUSA was aimed at preventing circumvention of PSLRA and that it therefore targeted only those claims that were meant to be brought in federal court subject to the PSLRA's restrictions. Senator Christopher J. Dodd, one of the bill's two principal Senate sponsors, stated that SLUSA "if enacted, will allow Congress to address this State litigation problem.... in a very targeted and narrow way, essentially preempting only those class actions that have recently migrated to State court, while leaving traditional State court actions and procedures solidly in place." 143 Cong. Rec. S10,477 (daily ed. Oct. 7, 1997) (statement of Sen. Dodd), 1997 WL 614735.[11] Nonpurchaser/nonseller fraud class action claims were not among the "traditional State court actions" Senator Dodd offered as examples of non-preempted claims, but he reiterated that "[t]his legislation has been carefully crafted only to affect those types of class actions that are appropriately heard on the Federal level." Id. (emphasis added). In addition, Representative Thomas J. Bliley, one of the House managers of the legislation, introduced the managers' joint explanatory statement accompanying the conference report by commenting, among other things, that "[i]f there is intentional fraud, there is nothing in this legislation or in the [PSLRA] to prevent those cases from proceeding." 144 Cong. Rec. H11,020 (daily ed. Oct. 15, 1998) (statement of Rep. Bliley), 1998 WL 720293. Rep. Bliley's statement suggests that he did not understand SLUSA to require removal of non-purchaser/non-seller class-action claims, because on that view SLUSA would extinguish those claims for failure to satisfy the Blue Chip standing rule.
 
 
 55
 We have already found, in Spielman, that SLUSA applies only to "those state claims that fall within its clear preemptive scope, thereby confining federal question jurisdiction under this statutory regime to a subset of securities fraud cases," namely those that represent plaintiffs' flight from the burdens imposed by the PSLRA. Spielman, 332 F.3d at 124. Reviewing the legislative history, we discern no similarly clear intent on the part of Congress to go beyond closing this "federal flight" loophole.
 
 
 56
 We are similarly unmoved by the other arguments pressed by the SEC and Merrill Lynch. The SEC argues that it may be difficult to determine at the complaint stage whether putative classes contain actual purchasers or sellers, and that this problem is obviated by its interpretation of the statute. A finding that SLUSA is broadly preemptive of any class action implicating securities fraud is admittedly easier to administer than an interpretation that requires courts to scrutinize the pleadings with care. We are, however, "constrained by our obligation to honor the clear meaning of a statute, as revealed by its language, purpose, and history," Int'l Bhd. of Teamsters v. Daniel, 439 U.S. 551, 566 n. 20, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979), and cannot permit our interpretation to be swayed by the concern that Congress has left the courts a difficult task. Cf. Brown v. R.J. Reynolds Tobacco Co., 52 F.3d 524, 530 (5th Cir.1995) ("Although we recognize the difficulties of applying [a legal test mandated by the statute in issue], ... we are constrained by the language of the statute."). SLUSA is explicit that it is not completely preemptive of state securities law, see Spielman, 332 F.3d at 123, and we cannot avoid the line-drawing issues that result.
 
 
 57
 Both Merrill Lynch and the SEC also argue that other elements necessary for maintenance of a successful action for damages under Rule 10b-5 — such as scienter, reliance, loss causation and compliance with the statute of limitations — should not limit the court's construction of "in connection with" under SLUSA, and that it is therefore improper to apply the standing rule applicable to such claims as a limit on SLUSA preemption. This case does not present us with an opportunity to consider the applicability of those other Rule 10b-5 requirements to SLUSA, but supposing arguendo that they do not apply, we reject the asserted analogy. SLUSA, as we have repeatedly noted, was intended to bolster the PSLRA, which in turn was intended to toughen the requirements for maintenance of a successful action under Rule 10b-5. We need not and do not reach the question, but see no contradiction in concluding that Congress could have intended to preempt state law securities fraud actions that if brought under federal law would fail for proof of loss causation or lack of timely filing, but did not intend to preempt a category of actions that, because of the nature of the injury alleged, could never have constituted a potential federal action.
 
 
 58
 In sum, we hold that in enacting SLUSA Congress sought only to ensure that class actions brought by plaintiffs who satisfy the Blue Chip purchaser-seller rule are subject to the federal securities laws. We note that this holding aligns us with every circuit court that has considered the question thus far. See Riley, 292 F.3d at 1343-45 (11th Cir.) (holding that under Blue Chip, SLUSA does not apply to claims dealing solely with the retention of securities rather than with their purchase or sale); Falkowski, 309 F.3d at 1130-31 (9th Cir.) (concluding, in determining whether claim is preempted by SLUSA, that Blue Chip purchaser-seller rule is satisfied); Green, 279 F.3d at 598 (8th Cir.) (interpreting Blue Chip to mean that "nonsellers and nonpurchasers of securities are not covered by SLUSA's preemption provision").[12] Given our conclusion that to be preempted, an action must allege a purchase or sale of covered securities made by the plaintiff or members of the alleged class, we analyze each of the plaintiffs' claims to determine whether the actions before us satisfy SLUSA's conditions for preemption.
 
 3. The parties' claims
 A. Dabit
 
 59
 Dabit asserts claims for two types of damages: (i) "holding" damages related to Merrill Lynch's fraudulent inducement of Dabit to retain certain securities and (ii) commissions that Dabit would have earned from clients that he lost as a result of Merrill Lynch's alleged fraud. Despite our application of the Blue Chip purchaser-seller rule, we conclude that Dabit's "holding" class as defined includes purchasers and thus that the putative class action includes allegations triggering SLUSA preemption.
 
 
 60
 A claim that a plaintiff purchased stock independent of any misrepresentation but was induced to retain it by a material misrepresentation or omission does not satisfy the Blue Chip standing requirement integral to the "in connection with" requirement of Rule 10b-5. See Abrahamson, 568 F.2d at 868. Other circuits have already concluded, at least in dicta, that SLUSA does not generally preempt such holding claims. See Riley, 292 F.3d at 1345 (noting that "under Blue Chip, SLUSA does not apply to claims dealing solely with the retention of securities, rather than with purchase or sale," but concluding that the plaintiff had failed to allege such a claim); Green, 279 F.3d at 599 (suggesting that a plaintiff could avoid SLUSA preemption "so long as his state-law claim does not require him to prove there was a sale or purchase of a covered security in reliance on the misrepresentation"); cf. Falkowski, 309 F.3d at 1131 (approving analysis in Riley and Green).[13] Our determination that the Blue Chip rule operates as a limit on the preemptive scope of SLUSA similarly commits us to the view that such holding claims are not preempted.[14]
 
 
 61
 When a plaintiff alleges that he purchased and retained stocks in reliance on a misrepresentation or omission of the defendant, however, the claim satisfies the Blue Chip rule and plainly falls within SLUSA's prohibition on state law claims "alleging ... a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1). In Riley, the Eleventh Circuit held that "when a claim that sweeps within its ambit actual purchases or sales of stock is covered by SLUSA, a plaintiff may not avoid SLUSA's restrictions simply by alleging that a given misrepresentation caused him both to purchase and [to] hold a particular security." 292 F.3d at 1345. If it were otherwise, a plaintiff who is perfectly capable of pleading a claim under Rule 10b-5 could defeat SLUSA preemption (and thus evade the heightened requirements of the PSLRA) merely by alleging what is almost invariably true — that the misrepresentation which caused him to purchase the stock also caused him to retain it for some period of time. See Riley, 292 F.3d at 1345 ("[A]ll investors, by definition, hold their shares for at least some time after purchase.").
 
 
 62
 Moreover, a plaintiff who alleges the purchase and retention of securities in reliance on the misrepresentation but who forswears damages from the purchase and seeks only "holding damages" has still run afoul of SLUSA, which by its plain terms preempts claims "alleging" fraud in connection with the purchase or sale, and not merely claims seeking damages specifically traceable to the initial purchase. 15 U.S.C. § 78bb(f)(1); see Prof'l Mgmt., 335 F.3d at 803 (holding that plaintiff "cannot avoid preemption by asserting it is only claiming damages suffered as a result of holding its stock" because "SLUSA's `in connection with' requirement... is not limited to cases involving damages claimed as a result of the purchase or sale of securities [but] .... applies to any covered class action alleging an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security"). Grafting such a limitation onto the statute's plain terms would vitiate Congress's intent in enacting SLUSA, because plaintiffs who have a federal remedy subject to the PSLRA's requirements could evade those requirements and bring a "strike suit" merely by purporting to forego some portion of their potential recovery. Congress forestalled such a move by prohibiting the maintenance of an action "alleging" fraud in connection with purchase or sale.
 
 
 63
 Dabit's amended complaint is generally careful to discuss only retention of a defined class of "ML stocks" during the relevant "class period." It is silent about when or how Dabit himself or any of his clients came to own any of these stocks, and charges only that Merrill Lynch made misrepresentations subsequent to Dabit's purchase. See, e.g., Amended Compl. ¶ 2 (alleging that "ML, after Plaintiff's purchase of the ML Stocks ..., failed to advise Plaintiff of the fact of the decreasing values of the ML Stocks, and misrepresented to Plaintiff that the ML Stocks were worthy of holding in Plaintiff's or Plaintiff's clients' portfolio...."). Dabit's putative class definition, however, fails to distinguish between those who came to hold an ML Stock before any relevant misrepresentation and those who purchased it in reliance on such representations. Dabit defines the class to include
 
 
 64
 all ... former or current account executives ... who, while employed by [ML] ... owned and continue to own one or more of the ML recommended securities identified in Exhibit A ... or recommended such securities to their clients ... and who suffered damages as a result of owning and holding such ML Stocks during th[e defined] time period, or who suffered damages as a consequence of the loss of clients due to ML's wrongful actions.
 
 
 65
 The class is elsewhere defined as all of those "persons who, while employed by [Merrill Lynch] as Retail Brokers, held individually or on behalf of the Classes' [sic] clients any of the ML Stocks during the period from December 1, 1999 through and including December 31, 2000 (the `Class Period') and were damaged thereby." Damages suffered from "own[ing]" stocks during the class period include damages incurred by purchasing them during that period, and nothing in the complaint excludes such claims. The complaint elsewhere alleges that Merrill Lynch made "materially false and misleading statements" in 1999 and 2000 — that is, throughout the class period — and that at least some of these false and misleading statements took the form of "buy recommendations." The two common-law causes of action incorporate all of the factual allegations in the complaint and stake the claims, respectively, on the breaches "in the manner described hereinabove" and through "[t]he wrongful acts alleged herein." Thus the complaint sweeps in the claims of brokers who purchased the stock during the class period in reliance on the misrepresentations and were damaged thereby.
 
 
 66
 Because the purchase of a stock in reliance on a misleading or fraudulent "buy" recommendation regarding the quality of that stock clearly satisfies the "in connection with" requirement as that phrase has been interpreted in the 10b-5 context, see In re Ames Dept. Stores Inc. Stock Litigation, 991 F.2d at 967; Korsinsky, 2002 WL 27775, at *5, the class as defined by Dabit includes those with preempted claims of purchase and retention. Lower courts have diverged in their approach to complaints that do not specifically allege purchases in reliance on the misrepresentation but that define the class to include members with SLUSA-preempted claims, with results that are difficult to reconcile.[15] While we must read SLUSA's preemptive provisions narrowly to avoid interference with state police powers that Congress did not clearly intend, we must also give meaningful effect to SLUSA's remedial goals with respect to the class of purchaser/seller claims that are clearly preempted. See Spielman, 332 F.3d at 123 & n. 5, 124. Where, as here, the complaint does not include sufficient information to permit the court to identify and separate preempted and non-preempted subclasses, we believe that the proper approach will ordinarily be to dismiss the entire claim pursuant to SLUSA. Given the close relationship in most instances between a holding claim and the purchase of securities, and given SLUSA's manifest intent to preempt state-law claims alleging fraud in connection with an actual purchase, it is sensible to require a would-be "holding" lead plaintiff expressly to exclude from the class claimants who purchased in connection with the fraud and who therefore could meet the standing requirement for maintenance of a 10b-5 action. See, e.g., Gordon, 2000 WL 556763, at *3 (holding that holding class claim was not SLUSA-preempted because "plaintiff has gone to great lengths to stress that his complaint alleges misrepresentations only in the holding of securities" and complaint stated that as of the date on which all class members had already purchased stock, it was fairly valued and no class member had been deceived into holding the stock).
 
 
 67
 We therefore hold that when the class definition includes persons with SLUSA-preempted claims and does not permit the court to distinguish any non-preempted subclass, SLUSA requires that the claim be dismissed. Ordinarily such dismissal should be without prejudice in order to allow the plaintiff to plead a claim sounding only in state law if possible. We accordingly reverse so much of the district court's order as dismissed Dabit's and the putative class's claims for damages resulting from the owning and retention of the ML stocks and remand the case with instructions to dismiss those claims without prejudice.
 
 
 68
 Dabit's claim regarding commissions lost when customers abandoned Merrill Lynch following disclosure of its improper practices fares better. This claim, brought on behalf of a putative class of brokers who "recommended [the defined ML stocks] to their clients" during the relevant class period and who "suffered damages as a consequence of the loss of clients due to ML's wrongful actions," relies not on the purchase or sale of any security in connection with the fraud, but on the absence of any such transactions by clients of the class members after the fraud was disclosed. Although we have not discovered another case discussing the effect of SLUSA on this apparently novel theory of recovery and express no opinion regarding its underlying merit,[16] it is clear that such a claim, by its very nature, does not allege fraud that "coincide[s]" with the sale or purchase of a security. Zandford, 535 U.S. at 825, 122 S.Ct. 1899. It is therefore not preempted by SLUSA.
 
 
 69
 SLUSA prohibits the "maint[enance] in any State or Federal court" of any "covered class action" alleging fraud in the purchase or sale of a covered security under state law, 15 U.S.C. § 78bb(f)(1), and defines a "covered class action" as a "single lawsuit" or "group of lawsuits" brought on behalf of more than fifty persons and meeting other specified criteria, 15 U.S.C. § 78bb(f)(5)(B). These provisions might be read to suggest that where a single complaint contains claims that include allegations triggering preemption and other claims that do not, SLUSA prohibits maintenance of the entire action. On this reading, SLUSA would effectively preempt any state law claim conjoined in a given case with a securities fraud claim, whatever its nature. We assume, however, that the historic police powers of the states are not preempted unless it was Congress's "clear and manifest purpose" to do so. City of Milwaukee, 451 U.S. at 316, 101 S.Ct. 1784 (internal quotation omitted). Thus we decline to read SLUSA as such an imprecise instrument. See, e.g., Falkowski, 309 F.3d at 1131-32 (affirming dismissal of preempted fraud claims but permitting maintenance of remaining contract claims). As we have already noted, SLUSA's language and legislative history indicate no intent to preempt categories of state action that do not represent "federal flight" litigation. We therefore reverse so much of the district court's order as dismissed the lost commissions claim and remand it for further proceedings.
 
 B. IJG
 
 70
 IJG defined its putative class to include "[a]ll persons or entities who maintained retail brokerage accounts with [Merrill Lynch], and who paid a commission or fees to [Merrill Lynch]," and seeks to recover damages caused by the payment of those fees and commissions in contract and under Minnesota consumer protection law. Like Dabit, IJG studiously avoids any specific allegation of a purchase or sale of security in reliance on the biased research that it received. IJG argues that SLUSA's "in connection with" requirement is not satisfied because its claims relate solely to the contractual obligations and statutory and common-law duties owed by Merrill Lynch to its retail customers and thus "do not arise out of the purchase and sale of securities of companies that Merrill [Lynch] researched, but from the purchase and sale of Merrill[ Lynch]'s objectivity."[17] The objectivity that IJG claims it believed it was purchasing, however, was objectivity with respect to investment recommendations. The alleged breach of contract and violation of consumer protection statutes consisted of the provision of biased and misleading advice notwithstanding this alleged promise. We hold that, while the claims for flat annual fees are not preempted by SLUSA, the claims for commissions paid to Merrill Lynch are preempted because they necessarily involve allegations of a purchase or sale of securities "in connection with" this alleged misconduct.
 
 
 71
 In reaching this conclusion, we are guided generally by the analyses of some of our sister circuits. In Behlen v. Merrill Lynch, 311 F.3d 1087 (11th Cir.2002), the Eleventh Circuit found that a plaintiff's claims were preempted by SLUSA where the object of the alleged fraud was to cause investment in inappropriate securities to which higher fees attached and the complaint requested damages for investments made in reliance on that advice. Id. at 1093-94. Under those circumstances, the fees and commissions paid were held to be "an integral part of the [underlying] transactions." Id. at 1094. In Dudek v. Prudential Securities, Inc., 295 F.3d 875 (8th Cir.2002), the Eighth Circuit analogously found the plaintiffs' claims preempted where they alleged that the "defendants' misconduct caused plaintiffs to invest in inappropriate securities" and therefore to pay higher fees and incidental costs than necessary. Id. at 878. In contrast, in Green, the Eighth Circuit reached the opposite conclusion regarding SLUSA preemption where the plaintiff sought to recover flat fees paid for real-time online stock quotes that were in fact several hours old and "nothing in [plaintiff's] ... complaint suggest[ed] that his cause of action ar[ose] from a sale or purchase of a security in reliance on information gained from [defendant's] real-time quote service." Green, 279 F.3d at 598-99. These cases suggest a logical distinction between claims that turn on injuries caused by acting on misleading investment advice, which (except in the case of holding or nonpurchase claims) necessarily allege a purchase or sale, and claims which merely allege that the plaintiff was injured by paying, independent of any given transaction, for a service that the broker failed to provide.
 
 
 72
 Consistent with this analysis, a few lower courts have analyzed claims similar to IJG's and have found that SLUSA preemption turns on whether some or all of the moneys paid for fraudulent or misleading advice were in the form of commissions tied to particular securities transactions. See Rowinski v. Salomon Smith Barney, Inc., 2003 WL 22740976, at *3 n. 5 (M.D.Pa. Nov.20, 2003) (distinguishing claim for flat monthly fee in Green from case at bar that sought commission fees, which were incurred only upon purchases or sales of securities and which claims the court held were preempted); McCullagh v. Merrill Lynch & Co., 2002 WL 362774, at *4 (S.D.N.Y. Mar.6, 2002) (finding preemption appropriate because even though "[p]laintiffs do not allege the purchase of specific stocks based on the recommendations, their allegations are clearly about the purchase of stocks because they seek disgorgement of commissions paid to [defendant]"); see also Shaw v. Charles Schwab & Co., 2003 WL 1463842, at *4 (Cal.Sup.Ct. Mar. 7, 2003) (finding SLUSA dismissal appropriate where claim concerning defendant's alleged overcharging of commissions was necessarily dependent on underlying securities transactions because purchases and sales of securities triggered commissions in dispute). We find this logic compelling. The commissions giving rise to the claimed breach of contract and violations of the state consumer fraud laws only accrued when plaintiffs purchased or sold securities through Merrill Lynch. The claims for commissions therefore necessarily allege misstatements or omissions in connection with the purchase and sale of securities, and are preempted. See Zandford, 535 U.S. at 820, 825, 122 S.Ct. 1899 (finding Rule 10b-5's "in connection with" requirement satisfied when "the securities transactions and breaches [complained of] ... coincide[d]" and "were not independent events.").[18]
 
 
 73
 The claims for the return of annual fees for unbiased research do, however, withstand SLUSA. An annual fee for services is paid whether or not the customer transacts on the account, and the misrepresentations inherent in the alleged nonperformance and statutory violations therefore do not necessarily "coincide[] with" a securities transaction, Zandford, 535 U.S. at 820, 122 S.Ct. 1899; compare Green, 279 F.3d at 598 (finding no SLUSA preemption where plaintiff "allege[d] no sale or purchase of a covered security, only that he did not receive the type of information from [defendant] for which he believed he had contracted and paid twenty dollars monthly") with Rowinski, 2003 WL 22740976, at *3 n. 5 (distinguishing claim for flat monthly fee in Green from case at bar that sought commission fees incurred only upon purchases or sales of securities).[19] Neither the breach of contract claim nor the statutory claims for the return of these fees necessarily rest on any allegation of a purchase or sale of a security.[20] See Minn.Stat. §§ 8.31 subd. 3a, 325D.44, 325F.68-.71; see generally Group Health Plan, Inc. v. Philip Morris Inc., 621 N.W.2d 2, 5-6, 12-15 (Minn.2001) (discussing requirements for maintenance of private action under consumer fraud statutes including Minn.Stat. § 325F.69); Crenlo, Inc. v. Austin-Romtech, 2004 WL 948352, *3-5 (2004) (discussing elements of breach of contract claim under Minnesota law).[21] The district court therefore erred to the extent that it held that the claims for annual fees wrongfully charged by defendants were preempted by SLUSA. Accordingly, we affirm in part the dismissal of the complaint and the denial of IJG's motion for remand, but reverse the dismissal in part and vacate the judgment in part with instructions to the district court to grant IJG's motion for remand as to so much of the claim as seeks recovery on behalf of a putative class of those who paid annual fees.
 
 CONCLUSION
 
 74
 We hold that (i) the meaning of "in connection with the purchase or sale of a ... security" under SLUSA is the same as under § 10(b) of the Exchange Act and Rule 10b-5, (ii) the purchaser-seller rule affirmed in Blue Chip applies to the construction of "in connection with" under SLUSA, and (iii) under the particular circumstances presented in these cases, the actions here contain allegations of misrepresentations "in connection with" securities transactions and are partly preempted under SLUSA. For these reasons, the judgment below is AFFIRMED in part, VACATED in part and REMANDED for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 Defendant-appellee Merrill Lynch & Co. is the parent company of defendant-appellee Merrill Lynch, Pierce, Fenner & Smith Inc. Because the corporate structure of these companies is not relevant on this appeal, we refer to defendants throughout this opinion simply as "Merrill Lynch."
 
 
 [2]
 IJG alleged violations of the Minnesota Consumer Fraud Act, Minn.Stat. §§ 325F.68-.70, the Uniform Deceptive Trade Practices Act, Minn.Stat. § 325D.43-.48, and Minn.Stat. § 325F.71, which provides additional penalties for certain violations of those two statutes when perpetrated against senior citizens or handicapped persons, as well as common-law breaches of contract and the duty of good faith and fair dealing
 
 
 [3]
 In addition, because of perceived inefficiencies inherent in dual state and federal securities registration schemes, Congress passed the National Securities Markets Improvement Act of 1996 ("NSMIA"), Pub.L. No. 104-290, 110 Stat. 3416 (codified in part at 15 U.S.C. § 77r), primarily to preempt state "Blue Sky" laws that required issuers to register many securities with state authorities prior to marketing in the statesSee Lander, 251 F.3d at 108.
 
 
 [4]
 SLUSA defines a "covered security" as "a security that satisfies the standards for a covered security specified in paragraph (1) or (2) of section 18(b) of the Securities Act of 1933, at the time during which it is alleged that the misrepresentation, omission, or manipulative or deceptive conduct occurred...." 15 U.S.C. § 78bb(1)(5)(E). Section 18(b) of the Securities Act of 1933 includes securities that are listed or authorized for listing on certain national securities exchanges. 15 U.S.C. § 77r(b)(1)
 
 
 [5]
 SLUSA defines a "covered class action" as:
 (i) any single lawsuit in which —
 (I) damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class, without reference to issues of individualized reliance on an alleged misstatement or omission, predominate over any questions affecting only individual persons or members; or
 (II) one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or members of the prospective class predominate over any questions affecting only individual persons or members; or
 (ii) any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which —
 (I) damages are sought on behalf of more than 50 persons; and
 (II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose.
 15 U.S.C. § 78bb(f)(5)(B).
 
 
 [6]
 After oral argument in these cases, the Courtsua sponte invited the Securities and Exchange Commission (the "SEC" or the "Commission") to submit its views on the issues presented in this appeal. Accepting our invitation, the SEC submitted an amicus curiae brief. Where Congress has expressly or impliedly "delegat[ed] authority to [an] agency to elucidate [an ambiguous] ... provision of [a] statute," the agency's interpretation will be given controlling weight so long as it is reasonable. Chevron, U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 843-44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); see also In re New Times Sec. Servs., 371 F.3d 68, 80 (2d Cir.2004). The preemptive provisions of SLUSA, however, unlike the parallel provisions of § 10(b), do not create powers in the SEC or vest the SEC with any rulemaking, adjudicative or other enforcement or interpretive responsibility. Because Chevron deference is due only where "Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law" and where "the agency interpretation claiming deference was promulgated in the exercise of that authority," United States v. Mead Corp., 533 U.S. 218, 226-27, 229, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001), we do not apply it to the SEC's views concerning the meaning of SLUSA.
 Where, as here, Chevron deference is inappropriate but "the agency has some special claim to expertise under the statute," the court defers to the agency's view to the lesser degree of extending "Skidmore deference." Coke v. Long Island Care At Home, Ltd., 376 F.3d 118, 133 (2d Cir.2004) (internal quotation and citation omitted). The level of deference owed to an agency's view under Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), depends on "all those factors which give it power to persuade, if lacking power to control," id. at 140, 65 S.Ct. 161, including "the agency's expertise, the care it took in reaching its conclusions, the formality with which it promulgates its interpretations, the consistency of its views over time, and the ultimate persuasiveness of its arguments." Cmty. Health Ctr. v. Wilson-Coker, 311 F.3d 132, 138 (2d Cir.2002) (citing Mead, 533 U.S. at 228, 234-35, 121 S.Ct. 2164). Because, for reasons explained infra, we would independently reach the same conclusion as the SEC on the applicability of § 10(b) jurisprudence to the meaning of SLUSA's "in connection with" requirement, we need not engage in exhaustive analysis of these factors. See id. at 137-38 (declining to specify "the exact molecular weight of deference" owed to agency's position where not outcome-determinative).
 
 
 [7]
 See also, e.g., Winne v. Equitable Life Assurance Soc. of the United States, 315 F.Supp.2d 404, 411-12 (S.D.N.Y.2003); Araujo v. John Hancock Life Ins. Co., 206 F.Supp.2d 377, 382 (E.D.N.Y.2002); Spielman v. Merrill Lynch, Pierce, Fenner & Smith Inc., 2001 WL 1182927, at *2-3 (S.D.N.Y. Oct.9, 2001). But see Shaw v. Charles Schwab & Co., 128 F.Supp.2d 1270, 1273-74 (C.D.Cal.2001) (declining to apply Supreme Court's flexible reading of "in connection with" requirement in § 10(b) in interpreting SLUSA because the statutes have different purposes).
 
 
 [8]
 Judge Newman, concurring separately inSpielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 332 F.3d 116 (2d Cir.2003), observed that the phrase operates somewhat differently in SLUSA than in the context of actions brought under § 10(b) and Rule 10b-5. Under § 10(b) and Rule 10b-5, a plaintiff must prove that the fraud was "actually `in connection with' the purchase or sale of a security, whereas under SLUSA, a defendant is required to show only that the plaintiff has alleged fraud `in connection with' the purchase or sale of a security." 332 F.3d at 133 n. 5 (Newman, J., concurring). Further, Judge Newman noted that there are at least three procedural differences: First, the roles of the parties are reversed because the defendant invoking SLUSA preemption argues that the "in connection with" condition is satisfied while the plaintiff argues that it is not. Second, under SLUSA the district court must definitively resolve that question at the beginning of the case as part of its jurisdictional inquiry. Third, because the result of SLUSA preemption may be remand to state court, unreviewable under 28 U.S.C. § 1447(d), the availability of appellate review depends on the result of the "in connection with" inquiry. Id. at 133. None of these procedural differences compels a different interpretation of the substantive reach of the phrase "in connection with" under SLUSA.
 
 
 [9]
 Here again, as discussedsupra note 6, we give the SEC's opinion as much deference as "the ultimate persuasiveness of its argument [ ]" demands, Cmty. Health Ctr., 311 F.3d at 138, but do not defer to its view under Chevron.
 
 
 [10]
 The conference report states that the purpose of SLUSA's preemptive provisions "is to prevent plaintiffs from seeking to evade the protections that Federal law provides against abusive litigation by filing suit in State, rather than in Federal, court," and further states that "consistent with the determination that Congress made in the [NSMIA] ..., [SLUSA] establishes uniform national rules for securities class action litigation involving our national capital markets." H.R. Conf. Rep. No. 105-803, at 13, 1998 WL 703964 (footnote omitted). The joint statement of the House and Senate managers of the conference committee declares broadly that "[u]nder the legislation, class actions relating to a `covered security' ... alleging fraud or manipulation must be maintained pursuant to the provisions of Federal securities law, in Federal court (subject to certain exceptions)." 144 Cong. Rec. H11,020 (daily ed. Oct. 15, 1998), 1998 WL 720293
 
 
 [11]
 Even some of the broad language of preemptive intent mentioned above lends itself to this construction: it would be odd to intend to "make Federal court the exclusive venue" for securities fraud claims that cannot be brought in federal court. H.R. Conf. Rep. 105-803 at 15Cf. Lander, 251 F.3d at 110-11 (considering plaintiffs' claims that SLUSA did not intend to preempt class actions concerning variable annuities because "insurance litigation has traditionally occurred in state courts," and rejecting that argument because plaintiffs failed to demonstrate that such litigation "always occurred in state court" (emphasis added)).
 
 
 [12]
 Merrill Lynch urges us to readProfessional Management Associates, Inc. Employees' Profit Sharing Plan v. KPMG LLP, 335 F.3d 800 (8th Cir.2003), as rejecting the view that the Blue Chip purchaser-seller requirement applies to SLUSA. The case does not go so far. The plaintiffs in Professional Management alleged that they "bought and retained their ... shares" in reliance on the relevant misrepresentation. Id. at 802 (emphasis added). The court held that in light of their allegation of a purchase in reliance on the fraud, the plaintiffs could not "avoid preemption by ... claiming [only] damages suffered as a result of holding its stock." Id. at 803. This ruling flows naturally from SLUSA, which bars claims "alleging" fraud in connection with purchase or sale, and is consistent with the Eighth Circuit's earlier holding in Green that the purchaser-seller rule applies. Green, 279 F.3d at 598.
 
 
 [13]
 See also, e.g., Cape Ann Investors LLC v. Lepone, 296 F.Supp.2d 4, 11 (D.Mass.2003); Dacey v. Morgan Stanley Dean Witter & Co., 263 F.Supp.2d 706, 711-12 (S.D.N.Y.2003); Shen v. Bohan, 2002 WL 31962136, at *3-4 (C.D.Cal. Oct.17, 2002); Korsinsky v. Salomon Smith Barney Inc., 2002 WL 27775, at *6 (S.D.N.Y. Jan. 10, 2002); Hardy v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 189 F.Supp.2d 14, 18 (S.D.N.Y.2001); Shaev v. Claflin, 2001 WL 548567, at *5 (N.D.Cal. May 17, 2001); Gutierrez v. Deloitte & Touche, LLP, 147 F.Supp.2d 584, 594-95 (W.D.Tex.2001); Gordon v. Buntrock, 2000 WL 556763, *4 (N.D.Ill. Apr.28, 2000).
 
 
 [14]
 States have diverged in their receptivity to such claimsSee Greenfield v. Fritz Cos., Inc., 98 Cal.Rptr.2d 530, 538-39 & n. 5 (Cal.Ct.App.2000) (listing jurisdictions permitting "holding"-type claims and noting that Connecticut does not), rev'd on other grounds sub nom. also Small v. Fritz Cos., Inc., 30 Cal.4th 167, 132 Cal.Rptr.2d 490, 65 P.3d 1255, 1261 (2003). We do not have to determine whether Oklahoma law would permit recovery on such a theory, but only whether the putative state law claim falls within SLUSA's preemptive scope.
 
 
 [15]
 Compare. e.g., Shaev, 2001 WL 548567 at *6 (holding that complaint that is "devoid of any allegations that make... a connection" between misleading conduct and purchase of stock escapes SLUSA preemption because "complaint does not indicate that the purported class chose to become ... shareholders based on any misrepresentations or omissions") and Gutierrez, 147 F.Supp.2d at 594 with Cape Ann Investors, 296 F.Supp.2d at 12 & n. 6 (holding that complaint that offers no means of distinguishing those who purchased in reliance on misrepresentation from those who merely held is SLUSA preempted and noting that "[i]f a class representative could give purchasers and sellers a free ride by salting into the class a member or two with holding claims, it would be a rare case in which SLUSA applied at all") and Korsinsky, 2002 WL 27775, at *5 (finding that complaint defining class to include those who purchased subsequent to misleading "buy" recommendation was SLUSA preempted); and Hardy, 189 F.Supp.2d at 18 (finding that complaint including class definition that "makes no effort to distinguish between customers who purchased before and after the stock rating allegedly became inaccurate" is preempted under SLUSA).
 
 
 [16]
 As notedsupra note 14, in considering whether a claim is preempted by SLUSA we do not consider the merit of the claim under state law. We therefore express no view on whether Oklahoma law would permit recovery on this theory.
 
 
 [17]
 IJG also argues that its contract claim is not preempted because it does not allege any misrepresentation, omission, or deceptive device or practice in connection with that claim. This is plainly not the case, since the complaint alleges that the breach of contract consisted of the provision of "biased advice" regarding investments. The statutory claims explicitly allege misrepresentations regarding the objectivity of Merrill Lynch's advice; these alleged promises of objectivity, in turn, are only rendered misleading by the complaint's further allegation that Merrill Lynch produced and delivered biased research. This prerequisite for SLUSA preemption is therefore satisfied as to all of IJG's claims
 
 
 [18]
 In support of its claim IJG cites to the district court decision inSpielman v. Merrill Lynch, Pierce, Fenner, & Smith Inc., 2001 WL 1182927 (S.D.N.Y. Oct.9, 2001), appeal dismissed on other grounds, 332 F.3d 116 (2d Cir.2003), and to Gray v. Seaboard Sec., Inc., 241 F.Supp.2d 213 (N.D.N.Y.2003). Those cases, however, are not helpful to IJG. In Spielman, the district court found that the transaction fees sought were not preempted by SLUSA because the alleged fraud concerned the commission structure itself, not the investment quality of securities. 2001 WL 1182927, at *4-5. That holding is suspect after Zandford, which held that Rule 10b-5 reaches misrepresentations that "coincide [ ]" with securities transactions whether or not they relate to the quality of any particular security, 535 U.S. at 820, 122 S.Ct. 1899, but in any event it is quite different from the case at bar, where the plaintiffs implicitly allege that they transacted in securities and were thereupon charged for biased investment advice. Such allegations fall squarely within SLUSA's reach. In Gray, the court found that plaintiffs had alleged that defendants misrepresented the source of their investment advice, 241 F.Supp.2d at 220, and further found that their breach of contract claim did not require them to allege any misrepresentation or omission, id. at 221. Here, in contrast, IJG alleges that the breach of contract and the statutory violations consisted precisely of the provision of misleading investment advice.
 
 
 [19]
 The SEC argues in its amicus brief that even annual fees claimed as damages, such as IJG's, should be preempted by SLUSA. The SEC's argument in this regard stems from its broader contention that "the `in connection with the purchase or sale of' securities requirement is satisfied when a broker-dealer makes a misrepresentation or omission to a customer that relates to the customer's brokerage account regardless of whether the deception coincides with, or could be expected to influence, a securities transaction." Brief of the SEC, at 11. Although the meaning of the "in connection with" phrase under Rule 10b-5 itself is a subject on which we owe the views of the SECChevron deference, Zandford, 535 U.S. at 819-20, 122 S.Ct. 1899, we are unable to regard this view as a reasonable construction of the Rule. See Mead, 533 U.S. at 229, 121 S.Ct. 2164 (under Chevron, court is "obliged to accept the agency's position if ... reasonable"); Daniel, 439 U.S. at 566 n. 20, 99 S.Ct. 790 (noting that "[o]n ... occasion[ ] ... this Court has found it necessary to reject the SEC's [unreasonable] interpretation of various provisions of the Securities Acts."). On this view, the scope of the "in connection with" language is essentially unlimited, reaching even misrepresentations and omissions regarding an account that do not coincide with and have nothing to do with a securities transaction. In Zandford, the Supreme Court noted that its holding that the misrepresentation need not relate to the value of a security "does not transform every breach of fiduciary duty into a federal securities violation" and gave as one example of a claim that would not satisfy Rule 10b-5 embezzlement of funds from a client's account. Zandford, 535 U.S. at 825 n. 4, 122 S.Ct. 1899. The SEC's view is impossible to square with this uncontradicted dictum, and appears to be a more expansive reading than the view to which the Court deferred as reasonable in Zandford. See id. at 819-20, 122 S.Ct. 1899. We therefore do not defer to the SEC's related view that a misrepresentation that does not coincide with any securities transaction satisfies the "in connection with" requirement so as to trigger SLUSA preemption.
 
 
 [20]
 IJG's prayer for relief seeks the return of "funds wrongfully withheld, charged or retained" by Merrill Lynch as well as "actual damages including, but not limited to, attorneys fees, costs and expenses incurred in paying for valueless services." While this prayer could conceivably be read to encompass consequential damages stemming from investment losses incurred in reliance on Merrill Lynch's investment advice, that is not the most natural reading. IJG disavowed any such construction of its prayer for relief in its brief on this appeal. Plaintiffs are therefore judicially estopped from seeking any such damages on remand
 
 
 [21]
 Again, we express no view on the viability of IJG's claims under Minnesota law